Good morning. Good morning, Your Honor, and may it please the Court. Sean Janda for the Federal Government, and I'll aspire to reserve three minutes of my time for rebuttal. I'm sorry, three minutes? Three minutes, hopefully. Plaintiffs challenge ATF's determination that a particular product, an AR-15 receiver blank, standing alone, is not a firearm subject to certain federal regulations. Plaintiffs are wrong about that on the merits, but much more fundamentally they have not established standing to challenge that determination. The determination does not regulate plaintiffs. It does not require them to do anything. It does not forbid them from doing anything. And the theories the plaintiffs put forward to establish their standing are exactly the sort of downstream cost theories and diversion of resources theories that the Supreme Court has twice recently rejected in, I think, materially identical postures. And so I'm happy to go through both. So in United States v. Texas, the states sought to vacate the Department of Homeland Security's regulatory guidance documents. And so I want to talk about that case and the effect that it has on this particular case. Was the state's challenge in Texas based purely on an APA cause of action under 5 U.S.C. Section 702, or did they sue based on any other statutory cause of action? So how does Texas apply here? Yeah, I mean, at least the main claim in Texas, what was an APA cause of action? Texas claimed that, and Louisiana, they were both plaintiffs, claimed that the DHS's guidance was contrary to law and was arbitrary and capricious. And the district court in Texas vacated the guidance. And so I think that's materially identical to what's happening here. I mean, they have challenged ATF's rule. They have gotten vacater of sort of one small piece of ATF's rule. But the fundamental problem, again, I think with their theory of standing, is that it runs through these sort of downstream attenuated indirect costs. And it's the exact same costs that Texas was asserting. But I guess, Mr. Janda, I take the Supreme Court in Texas on its own terms. Standing has three requirements, injury, causation and addressability. Texas is a addressability case. The court says several times that you cite a footnote where they gesture to the downstream case. But, you know, the idea of bringing in the Linda R.S. and those, that's just not at issue. It doesn't seem like the agency is contesting the state's ability to challenge the example as a portion of it. There's been no argument or suggestion that there's anything wrong with the fact that the valence is deregulatory or regulatory. We saw that in all the Mifflin-Pristone cases as well. I wonder, not to, I don't want to, so we had a case involving Washington, challenged the FDA, in which Idaho sought to intervene. And I'm wondering whether, kind of in terms of understanding the theory of injury, whether the Department of Commerce case, the New York case, may be a better place to argue. And then whether our case involving Washington and Idaho and the downstream effects there matter. It just seems like Texas is not about injury, which is what your argument is. Yeah, so maybe let me start with the, how to read Texas and then talk about. Yeah, point to me where it's regional holding on injury as opposed to addressability. Yeah, I mean, so I think a couple things. Number one, the court says a number of times, and we have kind of a string site in our reply brief, that there's not a judicially cognizable injury that Texas has asserted in that case. And I think the best evidence that this was holding about injury and not about at least factual addressability comes from Justice Barrett's concurrence and Justice Gorsuch's concurrence. Because what both of them say is, you know, we too think there's a standing problem in this case. But unlike the court, we would locate the standing problem in redressability and not in injury, in fact. And so I think both of them read the court's opinion, which again, I mean, repeatedly talks about judicially cognizable injuries as being about injury, in fact. And I think where the confusion comes is from what the court says at least once, maybe a couple of times, is something like, these are not the sorts of injuries that are traditionally redressable in federal court. But the way I would read that is not as about kind of factual redressability, but rather about whether this is the sort of injury that sort of throughout history, courts have thought provides a basis to come to court to seek redress in the first place. And that's what Texas thought was lacking. And that's exactly what's lacking here. I mean, well, it's I don't think exactly. So in Texas, again, it was what made it, I think what the court identified as odd and creating either the injury or redressability issue is that what the state was challenging was a document that purported to kind of withhold the prosecutor, the federal prosecutorial authority. And so most of the time, that's just not an issue here. I think in a very real sense, it is, Your Honor. And kind of let me say two things about it. Number one, I mean, this is civil enforcement. So was Texas. It was immigration enforcement. It wasn't criminal enforcement. But I think the fundamental problem that plaintiffs have with ATF's approach is that they are not enforcing the Gun Control Act's requirements as applied to this particular class of products. And that's exactly what was happening in Texas. Texas thought that the INA required the government to enforce the INA's detention provisions against the prosecutor. If we if we disagree with you hypothetically that that that Texas applies here, can you still prevail on your standing arguments? If so, just tell me why. I think so. And number one is even if you think Texas didn't go this far, I think there's a lot of material in Texas that we talk about in our briefs that really cautions courts to be wary when you have these kind of very attenuated downstream effects, particularly in the context of states. I'd point the court to footnote three of Texas, which I think raises the concern animating a lot of the court's discussion, which is that in our federal system, anytime the federal government does anything of significance, it's going to have downstream effects on states. I think footnote three is kind of the beginning and end of that that discussion. I mean, so take the New York case, the census case. So there there is evidence it was going to be a couple percentage points loss in funding that was after trial. Here we're on summary judgment. So as I understand, it's the state's obligation to point to facts but not prove them. But just a percent here, a percent there. And you've got these these products being marketed directly to Californians where it's clear they're being sold on those terms. Why isn't that enough to move the needle to make a marginal difference under New York between the world without example four and the world with it? Right. So I think that the big problem with the Department of Commerce's applicability here is that that case was about federal funding to states. And the court there thought that sort of a loss in in distribution of money to a state creates an injury in the state. And I think that's exceedingly different from the sort of if you you, the federal government, don't enforce this law against third parties. California wants you to do more. Correct. Is that correct? Because and then they're saying the fact that you're not doing more is going to cause crime and a lot of other things. Correct. And that's Texas. And I'll point the court to the First Circuit's opinion in New Jersey against Trump, which is cited in plaintiff's red brief. It's one of the cases about the birthright citizenship executive order in the First Circuit. In that case, it sort of fell on the funding Department of Commerce side of the line. But that's exactly the distinction that the First Circuit perceived between Department of Commerce and Texas. And I think, you know, whatever the federal government might think about standing in the loss of federal funding context, that's certainly a different context than the context where, I mean, really, number one, you're talking about under enforcement of federal law, which is what's happening in Texas. Number two, there's no federal money directly to states at stake. And then number three, I mean, you really are that the theory of standing running through a number of sort of causal links down to the idea that at some point, Texas is going to or sorry, California is going to have to spend or is going to choose to spend law enforcement resources to deal with this problem, because in their view, the federal government is not dealing with the problem enough. And that's really what was happening in Texas. So on the I guess to the merits, a question about let me know whether you think this is even kind of before us based on how it comes from the district court. So in Vanderstock, the Supreme Court explained that the statute at issue here nowhere says that a weapon must have a fully functional frame or receiver. So I take it to be the state's argument that the blanks that are being sold here are not fully functional, but that the statute doesn't require that. In fact, the statute would apply to a non fully functional receiver. Why isn't the ATF's example there? Contrary to that interpretation, is that a point that California raises from the district court decision? So I don't think so. I mean, let me say two things. Number one, California had a country at the center had a contrary to law claim in district court that was rejected by the district court and they haven't cross appealed on the contrary to law claim. Does it matter to the arbitrary and capricious then? I don't think so. And here's I think what Vanderstock says is for sure, some non-functional frames and receivers count as frames and receivers. ATF agrees with that. I mean, that's the whole point of the rule. But what Vanderstock also says is, you know, of course, at some point in the process, you get too far away from the functional frame or receiver for the product to qualify as a frame or receiver. And so it's really just about drawing that line. And the way the ATF has drawn that line in the context of AR-15 blanks, the receiver blanks, I think it's been remarkably consistent going back to the 1980s and sort of carried forward in the rule. And that line is really based on whether there is any machining happening in the fire control. But I guess that that determined I mean, if this is an evolution of an interpretation of the same statutory term, and I think the agency recognizes this over over time, tools and technology have made it quicker. So what was not readily convertible in the 1980s, it may be readily convertible now. So is this really just the difference that it's it's minutes and one click on a website if you have a functional receiver in a kit and maybe a couple hours and two clicks on a website if you have a blank? I mean, I think just to talk about the facts that ATF is receiving here, ATF's understanding, and this is in the Hoffman Declaration, is that with the jigs, the templates, the tools, all of those materials, the blanks that we're talking about are able to be converted into functional in an hour and a half to three hours by ATF staff. And that's the product that ATF thinks is a receiver. It's without the jig or the template, which makes the process much easier. Just standing alone, ATF's view is that that's not a receiver. And I think vendor stock is a product that vendor stock is talking about, according to the opinion of the court. One of them is completed in 21 minutes using common tools. One of them required two steps, each of which took what the court describes as quote minutes. And I think there's when we're talking about how close the product is to functional and where this line is drawn, there's a huge difference between minutes or 20 minutes and whatever is above the one and a half to three hours that the AR-15 blank standing alone would take to convert. And even besides the time, and what the Hoffman Declaration says, is ATF understands it to require a lot of skill and expertise to know exactly which material to drill out of the blank, to know exactly where to drill the relevant holes for the blank. And that's just the thing that I think in ATSU is very hard for an individual to do without the jigs, the templates, the tools, which would turn it into a regulated receiver under ATS view. And again— The only difference there is another click on a different website. I mean, I think you do have to go out and source the compatible jig. This may be getting to the second arbitrary and capricious claim about ATF not taking into account the full range of possible products in the world that could be compatible with any particular AR-15 blank. And I think there— Aren't they just taking the marketers of these products on their own, to their own words? I don't think so. Here's a kit, you can get part of it here, part of it here. Yeah, I mean, so let me say ATF, in the rule, says we will take into account any of the jigs, the templates, the tools that are made available by the seller to the purchaser, they're sold with the product from the seller to the purchaser, or they're possessed by the purchaser with the product. And so if you have a marketer who's saying, you know, go to this part of the website for one thing and this part for the jig and the template that's going to be compatible with it, I mean, that may well create a problem under the rule. But I think ATF is just not in a position, this is what the rule says, to determine what the whole range of possible products out in the world— Well, but I mean, but even if it's not on the same website, we're talking about things that could just be one search away, one, you know, one internet search away. So what, I mean, why isn't that relevant? I mean, they could be, they could not be. I think ATF in 2022, looking forward into the future and trying to draw a line, just has no way of knowing which AR-15 blanks are going to have easily available, found, compatible jigs, tools, templates. But the agency decided to do it categorically based on what the receiver, the condition of the receiver were, as it sounds like it would have had the option to more narrowly tailor this to things like the availability from the same site, other site, whether it's readily available elsewhere. I get that. I mean, one of ATF's concerns is what we don't want to regulate at the wholesale market, purchaser-to-purchaser. We don't want to create, you know, supply chain problems kind of elsewhere. But if this was the problem that's identified, and if readily convertible is this kit plus this kit, each a click, why did it have to, why did it draw it so broadly? Yeah, I mean, I think the problem, again, is that ATF is regulating to provide notice to the regulated public. And if you're a manufacturer, if you're a seller, if you're a member of the public, I don't know how you would have any way of knowing whether ATF is going to think that, you know, the particular AR-15 blank that you're procuring has somewhere out on the internet a compatible jig that they think you could find. And ATF is just not willing to go down or was not willing to go down the road of turning this into a thing where no one's going to have any idea in advance whether they have to comply with federal laws requirements. Okay, well, we've asked you quite a few questions, so I'll give you two minutes for rebuttal, even though we've taken up a fair amount of time. Thank you. Thank you. All right. Now, my understanding is we have one person that's taking 13 minutes and the other that's taking two. Your Honor, my name is Lee Crane for the Giffords Law Center. My friend, Clint Woods, is here from the state of California. I'm prepared to address every issue, and Mr. Woods has ceded his two minutes. So you're just going to, so you're just going to take all 15? If the panel is fine with that. And unless there's a specific question, I can't concede anything for the state of California, but I can argue all the legal issues. Well, okay. So just one person is going to talk for 15 minutes. Yes, Your Honor. Okay, good. Go. Thank you. May it please the Court, Lee Crane from Gibson Dunn for the Giffords Law Center. I'd like to start off with the colloquy that you all ended with. And I think it's actually more dire than different websites in a search. If you look at SCR193, there's actually advertising in the record where a manufacturer says, we sell the blank and we sell the kit. You can't buy them in the same transaction. So just do two transactions and you can buy them both and put it together easily. These are the types of things that ATF was willfully disregarding in contravention to its own regulation. When you look at the regulations, the district court below focused on time. And I think that was appropriate and critical for all the reasons the district court mentioned. But factor number four and number five are about the equipment required and the parts availability. So I think for the ATF to close its eyes to the parts availability, to how easy it is to get these products, the ATF concedes. You heard my friend on the other side admit a few minutes ago that with these types of products, it can take as little as one and a half to three hours. But the agency has to draw the line somewhere. And as I understand it, correct me if I'm wrong, the district court rejected the plaintiff's contrary to law claim. And so you're up here on just an arbitrary and capricious claim that's largely framed by the agency's own regulations. Vanderstock talks a lot about line drawing and how we're supposed to tell, you know, a grain of sand from a heap of it. Why isn't that just the agency's call? Or do you think that there's some work that the statute should be should be doing here? I'm not sure that's before us. So I'd say the district court found it was arbitrary and capricious on two grounds. And I think both of them are not line drawing. They're not exercises in challenging the agency's expertise, as my friend has said in his brief. The first point is the agency didn't consider its own factors. It didn't assess time. It didn't assess the other seven factors. It challenged. Now, the agency tries to minimize that, but it's important for the reason that you're noting, Judge Johnstone. It is effectively impossible for this court to assess line drawing questions, whether because line drawing can be irrational, can be arbitrary, can be capricious. But this court has no idea whether the products we're talking about took 20 hours to complete or took one. And in fact, in this record, as Judge Shen noted, a footnote 13 of his decision, the parties are undisputed that these are just a few hours. Now, why does that matter? This court, the Sixth Circuit and the Eighth Circuit have all said if you convert a product to a fireable weapon, in those cases it was machine guns under the NFA, two hours, six hours and eight hours respectively qualifies. But this record... Qualifies under the statute. Correct. But that's not before us because the district court ruled against you and you didn't appeal that. That's exactly right. And we are not asking for a ruling on that question. On that first point, what we're asking the court to affirm is that it was arbitrary and capricious to have not explained its decision, to have not looked at the factors the agency's own regulations require it to do. And that's this, this circuit's case law, as well as the Supreme Court says the agency has to look to its own regulations. It has told the courts what factors matter and then it has applied none of them. Well, so if we talk about the merits, you propose that ATF could have decided to regulate all unfinished receivers, regardless of whether sold separately from any other items. Their rule, on the other hand, decides to regulate some unfinished receivers, even if sold separately from other items. There is clearly an inherent line drawing that the agency must do. Why is it not practical exercise of the line drawing authority for ATF to decide to focus on whether critical operations have been performed on the unfinished frame rather than the entire universe of jigs, tools, and other items available across the market? So I think there are two pieces to that question, Your Honor. First, with respect to jigs, I think it's really important what the agency has said. If you look at example four in the open letter and all its rationales, it's the same product, the same degree of machining. In one context, ATF says it's a firearm. In another context, it says it's not. And the question is whether it's sold or possessed with or distributed with a jig. And what we see in the record, what we see in the ER from all the declarations, and ATF has never disputed, it's not that hard to get these jigs. It's not that hard to get instructions. So for the agency to determine that the same product is readily with the only question of whether these additional tools are accessible readily, if you change the hypothetical, so to speak, for the tool being a screwdriver, for instance, you can sort of see a world in which the agency closing its eyes to how readily accessible a screwdriver is in terms of their own factor of parts availability, of equipment required. So I think to Your Honor's question, I don't think it's a line drawing because we're talking about the same piece of aluminum to the same degree of machining, if that makes sense. And then with respect to the arbitrary and capriciousness, the first theory that the district court found was arbitrary and capricious. Again, it goes to not applying their own factors. The most critical factor the district court found was time, number one, consistent with this court's case law. So we don't think it's an exercise in line drawing. And if it is, particularly with the jig question, it's an arbitrary, it's an irrational, it's a capricious line drawing because the agency itself has admitted these same products are readily convertible. The only difference being how distributors structure it. But is it relevant that the statute itself and the entire regulatory scheme is premised on the purchasers and the recipients of the licenses, right? They are. So it's a scheme that regulates manufacturer by manufacturer. And so it's not necessarily just blinders that we're looking at what this manufacturer may sell from their website and what this manufacturer may sell from theirs. It is also the structure of the regulatory scheme. I don't know if I'd quite agree that the structure of the regulatory regime in this context is manufacturer or distributor. This is about a product. It's about a specific definition in section 921, readily convertible. But whether it's serialized or not, who does that? So it depends. I think the manufacturer likely would or certain downstream. I'll also note these products are already being serialized because when you have this classification, the question of whether it's sold with a jig or not, at some point in this stage where there's no machining difference, it's the same degree of machining, the manufacturers have to serialize it. The only question is whether it's sold with or distributed with a jig. So in terms of ATF's point about clarity, about consistency for the manufacturers, I think it's their rule that creates inconsistency and lack of clarity. So is there any evidence in the record that since ATF's final rule went into effect, criminal activity involving the unfinished receivers at issue in this case has increased? What are you relying on to say that a court can find it predictable that third parties will perform more unlawful activity using the specific unfinished receivers at issue here? So if you're referring to the Department of Commerce test, the predictability test, I think there's ample evidence in the record. And I point first to Special Inspector Gonzalez. I always get his title wrong. Special Agent, I think, Gonzalez. And what he says is before the final rule, when California is ground zero of this ghost gun epidemic, when we're talking about 34,000 of 70,000 ghost guns recovered in the nation being recovered in California, 15 to 20 percent of those weapons are AR-15 variant. But does he say anything about how they were sourced? I mean, your challenge is to the example, and I was unable to find anything in the record that suggests any marginal difference that example four makes. I don't think the record has that time period scope. I do know there are, if you look at one of the amicus briefs, there's the ghost gun report from California that they cite. And it does mention after the final rule goes into place, ghost gun handguns go down in recoverability. Long guns, rifles, these type of AR-15 products stay consistent or marginally drop. And I think that's important when you think about the way Judge Chen thought about this issue below is there's a ghost gun market, and there was a loophole that ATF said that we are closing. That's what we want to do. That's what they told the Supreme Court in Vanderstock. We are closing this loophole. They've not done that because they've left open this pipeline for these AR-15 variants. Now, they've taken lots of SKUs off the table. Handguns are down. Other products are out. But what we're talking about, if it was 15 to 20 percent recovery of AR-15s before the rule, that is only going to increase. And that's not our view. That's the government's view in Vanderstock. What they said is the ghost gun loophole is predictable, the cause. They told the Supreme Court that. They said it's predictable because these weapons are uniquely attractive to people who want to get around the regulatory regime. And in terms of your precise question, Judge Johnstone, about these specific products, these specific variants, you are correct. There's no specific piece of record connecting guns recovered to these products, but it's impossible because— Well, I guess—so here's what we said in the Washington case, and this was involved Idaho's challenge, similarly to a withdrawal or lessening of a particular product, in that case, Mifepristone, from the market as a regulation. And Idaho was challenging that and said, no, you've got to go back in and challenge that. I said it was insufficient for standing for two reasons. First, the state's prediction that it will lead to illegal use of the product depends heavily on speculation that the users will break state law. That's not a proper basis for standing. Second, if the availability of retail and mail order dispensing—again, some similarities here—make the product more difficult to police, we have never held that a logistical burden on law enforcement constitutes a cognizable Article III injury. Holding otherwise would greatly expand state standing to challenge any federal action that allegedly increases crime or disorder or imposes indirect compliant costs for state law enforcement. Why does that not control here? So I think there are two premises baked in there. And the first, Department of Commerce squarely deals with that question. This is, I believe, a post-Department of Commerce case. But I think the standard and the language in that case answers the question. Because you mentioned the unlawful activity. Department of Commerce says the question in terms of the chain of causation here, it doesn't have to be certain. It has to be— There's no chain. There's one link in Department of Commerce. It was proven at trial that through specific evidence targeted this exact question, that a change of the census question would reduce the money paid directly to the state by 2 or 3 percent. That's one link. There's a lot more links than that here. I think the causal chain I'm referring to is the court expressly says that if the causal link requires the violations of law, it requires the government to violate the law. Because it was talking about people reducing responses to the census in response to the fear that the government was going to then use the information in other contexts. The argument was made on the other side. Well, you have to presume in that causal link that the government will violate the law. We can't do that. There's a presumption of regularity. I want to make sure Judge Thomas has a question. No, thank you. It was asked. Thank you. Oh, sorry. If I may continue. And what the Supreme Court says is the fact that one piece of the link may include unlawful activity doesn't make it any reasonably less probable. Here, what we're talking about, the connection between the products at issue and the harm here is the very nature of this market, this loophole, and the significance of the problem. I'd go again to Special Inspector Gonzalez's point. 15 to 20 percent of the ghost guns before the rule recovered were these AR-15 variants. If what remains on the market are these products, and we're talking about the products in the classification letter, there is no other evidence in the record about other types of AR-15 ghost guns that potential felons, potential criminals—one of the amici briefs talks about potential terrorists—can get beyond these products, which are squarely being currently deemed outside of the regulatory framework. When you look at that market, when you look at the funneling of this stream of ghost gun commerce to this one particular skew, I think that does establish the reasonable probability, particularly with respect to prospective relief moving forward, as we're talking about here in the adjunctive context, or in the vegator context. I see my time is running short. Judge Johnson? I think you've got two minutes left. Yes, yeah. I'm happy to address the state of Texas question, unless the Court has further questions. I think, Your Honors, the colloquy, I think, is exactly right. It is a redressability question. The Court in Texas says expressly it's an extraordinarily unusual case, and also says expressly that monetary injury is of the type that California has advanced here. Well, you don't agree that Texas controls this case, but there are a number of similarities between this case and your case. I want to make sure I'm clear on some of those. Your cause of action is the same as the cause of action that the Texas plaintiff sued on. The plaintiff alleged harm in that case was monetary injury, like the harm you allege here, and you seek vacateur of the agency's policy or determinations, like the plaintiffs there did. I believe Texas may have had other causes of action in addition to an APA cause of action, but I think there are APA causes of action in both. I think the Supreme Court itself says monetary injury is an injury. It was simply saying that the redressability of that injury in that context was not... The Law Center's theory of standing in this case is based on having spent funds to preemptively address increased crime in the future involving the unfinished receivers at issue in this case. But prior to ATF's final rule, no unfinished frames or receivers were... But prior to ATF's final rule, no unfinished frames or receivers were covered under the Gun Control Act. So why would ATF's decision here deciding not to regulate only a subject, a subset of the unfinished receivers, lead to more crime? So I think what you see is this problem is of relatively recent vintage, and you see that in the Vanderstock record as well and in the record here. It really exploded around 2017, 2018, 2019, and that's when you see California starting to make moves and starting to see expenses from this problem. The loophole remains open because of this problem in the law, because of this arbitrary and capricious designation of these two materially identical products that are machined no differently, one being sold with a jig, one without, but a jig that you can get in the market very easily. And so I think California's need to continue to spend to combat that problem has changed, is ongoing, and is redressable at least to a certain degree, and that's all it has to be Massachusetts v. EPA to reduce that problem. It won't necessarily relinquish the gun violence problem, but it will impact it materially, and we see that the way the ghost gun rule is working with respect to the handgun products that are off the market now. I mean, Mr. Crane, you agree, if I may. You agree, this is on summary judgment, and so that under Lujan, you have to, you have the burden of coming forward with specific facts that establish the standing. Okay. Can I just qualify that? So there were cross motions here. Our burden on their motion was to come forward with evidence that you view in the light most favorable to the non-moving party, that a reasonable fact finder could find established standing. So all inferences need to be drawn in our favor in the context of their motion. In the context of our motion, we did not move on standing specifically, but we do need to come forward with prime evidence. You still have to reach it either way. Does that change the Lujan rule of what you have to come forward with in terms of facts? No, I think the Lujan rule is we need to come forward with the evidence that any litigant would need to come forward in the procedural phase. And I think the way that works is a little bit differently, whether it's our motion versus theirs. Okay. And I guess I just have one more question about, and now thank you for rolling with us as we asked about kind of the state's standing. How does Giffords Law Center have standing after Hippocratic Medicine? So our view is, as you see from our brief, is Hippocratic Medicine was not a sea change. The holding of that case is that an organization that has a strongly held belief against the product and is spending to specifically combat after a government action to create standing does not have standing. To specifically combat how? Through advocacy? If I recall in that case, it was advocacy. It was studies that they did after the FDA had acted. Here, when you look at the Cudeleta declaration, she lays out four different categories of how Giffords has standing of ongoing core business activities. And I know you all are dealing with that in the Mays case, so you know better than I where this might go. But when you look at those four activities, whether it's a new standard or whether it's the consistent standard of the circuit, we're talking about not just legislation, not just advocacy. Giffords does educational work. They partner with direct services organizations. If you look at the Cudeleta declaration, specifically talks about Oakland as an example, where Giffords partners on the ground, and that has become more difficult with respect to this ghost gun problem that is now coming even more into the fold by the fact that these products are being funneled, not just to handguns, but to long, deadly AR-15 weapons. And the other thing I'd say is, Your Honor, just as a reminder, you don't need to reach Giffords if you find California has standing. And I know the Mays en banc court is considering the effects of Hippocratic Oath. Our view is Hippocratic Oath is not a sea change. Chief Judge Murguia's decision in Nome reaffirmed that. The Fifth Circuit has reaffirmed that. The Fourth Circuit, I'd also refer you to the Republican National Governor's case, which I think has a similar theory to the one we're putting forth from the Fourth Circuit. All right. Thank you for your argument. Thank you, Your Honor. All right. Since we took you a little over three minutes over, I'll give you three minutes for rebuttal. That's my fairness doctrine. Thank you, Your Honor. So I just have three points I'd like to make, two on standing and one on the merits. So first on standing, I do think it's important to emphasize how thin the record here is on standing for California and, I mean, really the attenuated chain of causation that they're trying to have the court follow through. I mean, number one, as before on the other side, there's not a single piece of evidence in this record that talks about the particular products at issue in this case that there is a dispute about. There's a lot of generally about ghost guns before the rule was put into place. The whole point of the rule, of course, was to address that problem. And I think we're in agreement with the plaintiffs about, you know, 97 percent of the rule and the way that it addresses that problem. And so there's just, I don't think anything in the record that you can really point to to establish the factual basis for the standing. And I think that's magnified here by the chain of causation. I mean, as I understand their chain of causation, it looks something like, manufacturers will make these AR-15 blanks available online. Some number of people who are not able to possess firearms will procure them and will spend the many hours it takes to put them together and will do that sort of properly, notwithstanding both the difficulty of doing that and California's own regulation of these products, because California has itself stepped into the regulatory space using its own sovereign authority. And then those people will, having sort of already perhaps violated California law, will take the products, will commit more crimes in California if they wouldn't have otherwise committed, and that there will then be law enforcement costs in response to that. I mean, that's an exceedingly attenuated chain of causation. When you can't point to a single piece of evidence in the record to support that chain of causation, I think that's a really serious problem. And then second, and relatedly, I think if the Court's going to say that that's enough with that chain of causation and with that lack of evidence, it really runs into the problem identified in the Washington and Idaho case of, at that point, I mean, I think any state can sue any time. It disagrees with what the federal government is doing, because you're always going to be able to hypothesize some chain of causation with many, many, many, many steps down the line, that there's going to be some effect on the states. And I think in Washington and Idaho, this Court, in Texas, the Supreme Court, in Alliance for Procratic Medicine, the Supreme Court, is really concerned with the idea that every political dispute is now going to get dragged into the courts. And that's not how the court system is supposed to function. That's not how political disputes are supposed to be resolved. And that's not how things have worked for the 250 years of this country's existence. And I mean, in making that point, the Supreme Court explicitly pointed to disputes about enforcement of gun laws as the kind of thing that is reserved to the political process, and that they are concerned that accepting these sorts of theories of standing is going to drag into the courts where they don't belong. And then third, just briefly on the merits, I think the Court is correct that Vanderstock really recognizes that this is a line-drawing problem. It's a thorny problem. It's a difficult problem. And it's one that the agency has been approaching with decades and decades of experience and expertise. And at that point, and I think when the agency is applying those decades of experience to this technical problem, their resolution of that problem really deserves a lot of significant weight from the Court. And so we would ask the Court to reverse or vacate. Thank you. Thank you both for your argument in this matter. This matter will stand submitted. The Court will take a short bio break for five minutes, and then we'll be back to hear the final two cases. Thank you.
judges: CALLAHAN, THOMAS, JOHNSTONE